Rose Ann Karam
3501 N. Camino Esplanade
TucsonAZ 85750
(520) 730-8802



```
_✓_FILED      ___LODGED
___RECEIVED   ___COPY

    SEP 1 3 2018

CLERK U S DISTRICT COURT
  DISTRICT OF ARIZONA
BY_____DEPUTY
```

# IN UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Rose Ann Karam,

           Plaintiff,

v.

University of Arizona;
Diedre Lamb;
Amy Kennedy;
Shanna O'Connor;
Jeannie Lee;
Theordore Tong;
John Murphy;
Lisa Davis;
Janet Cooley;
Lisa Davis;
Maryam Fazel;
Elizabeth Hall-Lipsy;
Jason Karnes;
Marion Slack;
Jenene Spencer;
Richard Vaillancourt;
Terri Warholak;
Christopher Hulme;
Southern Arizona Veterans Administration Health Care System;
Tara Evanko;
Stephanie J. Davis;
Thao Truong;
Katherine A. Liu;
Davis Monthan Air Force Base;
Louis Feldman;
Suzanne Toyama-Bodnar;
Major Michele Serrano;
Daniel Malone;
Lisa Goldstone;
David Lee,

           Defendant(s).

CASE NUMBER:

**CV 18-0455 TUCRCC**

**COMPLAINT**

## Jurisdiction

This court has jurisdiction over this matter pursuant to This court has jurisdiction over this under 28 U.S.C. § 1331 and Pursuant to 28 U.S. Code § 1391. Venue is proper in this court because all of the defendants are located in Arizona District, Tucson Division and the acts described took place within the Arizona District, Tucson Division.  §§ Civil Statutes 42 U.S.C.A. § 2000d (Title IX Violation), 42 U.S.C. § 1983,  Violation of Section 504 of the Rehabilitation Act, Violation of 42 U.S. Code § 1985, Civil Conspiracy, Intentional Infliction of Emotional Distress. The plaintiff is a resident of Tucson, Pima County, AZ and a citizen of the United States. The Defendant are residents of the District of Arizona.

## Complaint

1. The Plaintiff has experienced increasing hostility since the first day (08/17/2014) of orientation when she was subtly warned/threatened by her mentor, Lisa Goldstone; a warning/threat that was not posed to her other student mentee.
2. By the week of 9/1/2014, rumors started circulating about the Plaintiff being bipolar, having a drug problem and having been on the waiting list before actually being admitted to the University of Arizona College of Pharmacy. Plaintiff's attendance in classes dropped significantly at this point.
3. Mid-semester: Plaintiff met with Dr. Tong at mid-semester regarding poor performance in a class; was subtly discouraged from continuing in the program. Was asked twice, "Is this really where you want to be?" Other students I knew who had met with him were not asked this question.

4. 11/19/14  Plaintiff saw psychiatric provider for on-going ADHD treatment. Four hours later, what Plaintiff told her provider came out of one of her professor's mouth (David Lee). While completing an exam (Plaintiff was the only one left), David Lee left Plaintiff alone to go down to the Student Services office. When he returned, he basically listed everything the Plaintiff had told her provider earlier that day and negated it.  I never went back to another psychiatric provider, and my ADHD remains untreated. A subpoena/review of their phone records from this day will provide the person who was the go between from the Plaintiff's provider to the College of Pharmacy's Office of Student Services. I am confident I know who this was.

5. By third semester, the rumors continued. Now, Plaintiff was receiving sarcastic remarks from faculty (Terri Warholak). 11/3/15 Plaintiff had mid-semester appointment with Dr. Tong. I informed him the Plaintiff used to be involved with the individual they had given access to the students and faculty, that individual did not have my best interests in mind when he interfered with my schooling, and his involvement made me not want to be there. Dr. Tong kept cutting me off. (Meeting recorded and available)

6. 3/9/16 During Plaintiff's annual meeting with mentor, Dr. Lisa Goldstone, Plaintiff made reference that she felt zolpidem was overused and maybe it should not be first line. Dr. Goldstone subtly referenced something from my Protected Health Information which she was not authorized to know. It was taken out of context and utilized in a derogatory manner. This information would have come from the same provider as the information described by David Lee on 11/19/14.

7. ~5/6/16 During Plaintiff's group's poster presentation (the end of a year-long project) for PHPR 863b, Dr. Warholak (class/project instructor) was respectful to each of my groups' members except the Plaintiff. While the Plaintiff spoke, she looked straight down at her watch the entire time and cut the Plaintiff off after only ~45 seconds. After cutting the Plaintiff off, Dr. Warholak asked others questions which the Plaintiff would have answered had Dr. Warholak had not stopped her prematurely. Plaintiff did not speak anywhere near as long as the others in the group, and she was prepared in her presentation.

8. ~5/3/16 The first 10 minutes of Dr. Vaillancourt's last lecture was on the cheating of one of the students (recorded). After the cheating discussion, the student next to the Plaintiff said something to the effect of, "at least you were not expelled" or "you could have been expelled." (Not recorded) At this point, I realized the cheating rant was directed towards me, and that several of the students had been acting more distant towards me lately. That lecture video remained up and available until the end of the year; normally they are kept up until the next semester.

9. 5/6/16 Plaintiff had meetings with Dr. John Murphy and Dr. Richard (separately) Vaillancourt regarding the cheating discussion and subsequent student behavior. Plaintiff told them they just rewarded slander. Furthermore, Plaintiff had felt violated every day she had been in the program. (Recordings available)

10. Plaintiff sent an anonymous email to Dr. Christopher Hulme and Dr. Theordore Tong regarding academic dishonesty during exams where a student was taking screenshots of exam questions. 5/6/16 Plaintiff emailed Dr. Tong and Dr. Hulme thatsheI was the individual who had reported the cheating as well as who had perpetrated what she had described.

11. Fifth semester: From the first day of classes, Plaintiff experienced significant hostility from 80-90% of the students. Most would not look at or talk to the Plaintiff. Some would just walk away. Most of the professors did this as well but not as overtly (Daniel Malone, Christopher Hulme).

12. Plaintiff has a documented learning disability which allows her to have an accommodation (time and a half) on timed assessments. Plaintiff initially requested this for PHPR 875b on 8/29/16 and assumed it would include the writing of timed SOAP (subjective, objective, assessment, plan) notes. Plaintiff has a processing disorder which delays/prolongs writing. Just in case, she requested clarification from the class co-instructors (Dr. Kennedy and Dr. O'Connor) on 9/2/16. When told the SOAP notes would not be covered by the accommodation, Plaintiff contacted Diedre Lamb, the University of Arizona Disability Resource center representative for the College of Pharmacy. I reminded Diedre that these accommodations extend into the workplace and that I would likely be filing a complaint with the US Department of Education if denied. Interestingly, Diedre Lamb refused to return Plaintiffs' calls and emails the day of the second SOAP note (9/13/16), and Plaintiff didn't know the final decision on the matter until the day AFTER the second SOAP note assessment (9/14/16). During the second SOAP note, Plaintiff received dirty looks from my PHPR 875b group members. On 9/15/16, Plaintiff's PHPR 875b group members started harassing and instructing her on what she should be doing to complete the SOAP notes in less time. (Recording available) Plaintiff had not told them about her accommodation nor the denial of them. This continued through the next SOAP note date 9/27/16 when Plaintiff pointed out to a group member that he was being recorded. The harassment regarding the Plaintiffs' times stopped immediately. At this point, Plaintiff only attended class when it was required. (See attached emails) (Phone calls with Diedre Lamb and student harassment audio-recordings available upon request)(Diedre Lamb refusing student access to case notes in computer)

13. In PHPR 875b, we had pre-class quizzes on-line. Plaintiff had technical difficulties, and the quiz did not submit appropriately. Plaintiff notified Dr. Kennedy and Dr. O'Connor. It took Dr. Kennedy two weeks to respond. When she responded, she indicated there was no evidence of the quiz having been attempted. Plaintiff emailed her evidence of the quiz being attempted to which she never responded. Furthermore, Plaintiff contacted D2L, the system administering the quiz, who indicated they had documentation of that quiz with 5 saved answers. I never received credit. This was two days after Plaintiff threatened to file a complaint with the US Department of Education regarding the ADA accommodation violation. (Emails available)

14. Diedre Lamb had offered to check-out headphones to wear during exams (PHPR 875b). However, it never happened because Dr. Kennedy and Dr. O'Connor deemed headphones to be inappropriate for exams. (Denial of accommodations)

15. Diedre Lamb proctored the first exam for PHPR 875b for students with accommodations. There was banging on the wall on and off throughout the exam and Diedre Lamb did nothing to stop it or

provide ear plugs. I thought this was interesting for the exam she was initially going to provide me with headphones but did not. They did change the room for the next exam. (Audio-recorded) •T

16. The class before the first PHPR 842 exam, the instructor said we would be video-recorded during the exam to prevent cheating. But on exam day, he rescinded that statement. When I sat for that exam, I had nobody seated to my left or my right. However, there was someone seated ~3 feet in front of me. I had Peter Rottier (in charge of managing the testing software during all exams) stand directly behind me several times during the exam for no apparent reason. It was intentionally hostile. He did not do this with anybody else.

17. I reported an episode of academic dishonesty in PHPR 843 on 11/14/2016 to Dr. Elizabeth Hall-Lipsy by individuals in a group with me. I provided proof regarding what was done. The next day, there was a definite increase in dirty looks and people unwilling to make eye contact. This hostility increased over the next two weeks which precipitated a nasty email I sent Barbara Collins in student services on 12/1/16. (Emails) (Audio-recordings available)

18. 10/25/16  I decided to take the PHPR 807 exam 2 with the class rather than with extended time because I would have had to start the exam two hours earlier than the rest of the class if I wanted the extended time. Dr. Davis stood ~8 feet right in front of me and watched me during ~75% of the exam. There was nobody seated in front of me or to my left, and I positioned my body so that I faced away from the person to my right throughout the entire exam. Dr. Davis only left that one spot to answer questions. Then, she made me submit my exam before two other students (who were not approved for accommodations.. Time of test submission can be verified through the ExamSoft system. From this exam and the one with Dr. Urbine, it was clear that if I sat for exams with the general class, it would always be hostile.

19. Dr. Malone (Phi Delta Chi faculty advisor) essentially refused to look at me during any of the 5 classes he taught for PHPR 842. It did not matter if I was sitting in the front row or the back or if I was handing an assignment directly to him.

20. The worst bullying I experienced was from those who were my "brothers" in PDC fraternity. In general, most of them just avoided eye contact, would not look at me or would not talk to me. Several times I sat next to "brothers" who never said one word to me. Subsequently, I chose to leave the organization that semester.

21. 10/25/16  Dr. Patrick Lord (IPPE/APPE preceptor) answering his phone but saying it was not him. The calls were recorded. (Recordings of calls available and voice analysis available indicating it was the two calls were with the same individua)

22. Had my exact grade in PHPR 875b verbalized to PHPR 875b group by one of its members. She was saying how there was no chance for an A in the class now. (Audio recording available)

23. I was harassed by another PHPR875b group member about not getting the material because I did not attend class. I informed her and my group that I did not attend class because I did not learn well in a hostile environment. She laughed and said I should meet with Dr. Kennedy during office hours for assistance. (Recording available) (Date was toward the end of November 2016)

24. All exams are computerized and given via ExamSoft. Peter Rottier is present at all class exams to troubleshoot any difficulties with ExamSoft or to provide extra laptops should someone be in need during the exam. This is his full-time job.
    a. 2/10/17 I emailed Dr. Patanwala that my computer kept shutting down and I was concerned about the exam I would be taking at the Disability Resource Center the later that morning. His return email was hostile. Contrary to Dr. Patanwala's return email, it is Peter Rottier's job to assist in these areas.....especially in terms of downloading ExamSoft. I ended up having to use my own computer for this exam, and it shut down a countless number of times during the exam. The number of times it shut down should be able to be traced through ExamSoft. (Emails available)

25. I needed to find a senior project advisor. Based on what had transpired the last semester, I knew this was going to be a problem. I stopped by one professor's office, Dr. Kathryn Matthias, and she asked me to email her. When I emailed her, I never heard back. I emailed Dr. Jeannie Lee who responded immediately that she was unavailable. I emailed Dr. Fazel and Dr. Phan as well. I have attached the emails. None of these individuals had any intention of working with me.

26. 3/21/17 I requested the extended time accommodation for PHPR 811 for the SOAP notes. This request was denied by Diedre Lamb despite the fact that I have repeatedly emphasized that this accommodation can extend into the workplace. She communicated the denial to me over the phone.

27. Dr. Marion Slack went out of her way to delay my progress into finding a senior project as well as individuals for me to work with. As long as I was working alone, she could sabotage my progress. She would say that she was going to talk with a graduate student with similar interests but never did. She kept saying she was going to email the second year students but would not actually do it. (Emails attached) (Audio recordings of meetings available)

28. 4/3/17 Dr. Marion Slack canceled a meeting scheduled for 4/6/17 saying she was leaving town the day after the meeting was scheduled for. I emailed her back on 4/5/17, but I did not hear back from her until 4/11/17. This project had already been significantly delayed. I find it interesting that I received this email just about an hour after I received the email from the University of Arizona Office of Institutional Equity. (See attached emails)

29. 4/3/17 In PHPR 811, they had a timed in-class assessment which was graded based on completion. None of their prior in class assignments had been timed and graded. I received a 50%. I emailed Dr.

Fazel / Dr. Lee repeatedly to say this was a problem with my accommodation. Can we arrange something. Again, I find it interesting that the only timed and graded assignment in this class is the same day I received the email from the Office of Institutional Equity. (Attach emails)

30. 4/4/17 I sent an email to Dr. Karnes regarding problems with submitting a prior quiz and clarification of another quiz question. First, it took him six days to reply. Also of note, he says per the syllabus it was too late to contest quiz questions or report IT issues per the syllabus. However, the syllabus did not address IT issues. Again, this is the day after the email from the Office of Institutional Equity. (See attached emails)

31. 4/14/17 I received an email from Diedre Lamb approving me for the time extension accommodation for the last SOAP note in the class on 4/24/17. However, her email did include misrepresentations of the facts. Before the last SOAP note, I was provided specific times as to when everything would take place as had happened with all the other SOAP notes with the OSCE's. With this one, everything was started later than described and then altered/misrepresented along the way. For example, Dr. Fazel would say I had 10 minutes left. Then, she would come back and tell me she was mistaken, I had 5 not 10 minutes left. She interrupted me continuously throughout writing of the SOAP note. I received the lowest grade on this assessment, and it was not from a lack of studying. (Audio-recording available)

32. 5/4/17 Dr. Marion Slack gave me an additional assignment regarding my senior project during finals week. This assignment was not described in the class syllabus or in the example systematic review I was provided. It was not given to any of the other students with whom she was working. It was not described in the Project Guidelines. (See emails)

33. Dr. Marion Slack kept me working alone so she could make this process as difficult, unpredictable and laborious as possible. She was only willing to provide me individuals to work with when I was entering my APPE rotation. At this point, I am confident the reign had been passed to Dr. Tara Evanko to make my life unnecessarily difficult.  o When she finally emailed that she had 2 students available to work with me, I never responded back. In all likelihood, these students would have sabotaged my progress.

34. For Exam 3 in PHPR 875c, Dr. Patanwala described a large curve was applied, but he never described how much the scores were curved. I wonder if everyone received the same curve. I thought it was interesting that I received essentially the same grade I had received on the prior exam.

35. 5/8/17 I met with Dr. Patanwala to review my last exam. In class, he had indicated he would look over our calculations if our answers were close. I had missed a calculation question which was surprising since I was confident about those answers. When I asked to review my work, he said I couldn't. I called the DRC where I took the exam. Apparently, the papers we did our calculations

on were not scanned and sent back to the professor. So, we (students testing in the disability center) were not given the same consideration as the rest of the class. I received a B in this class. I missed an A by one question. Between what happened on the first exam, the vague curve, not being able to review my entire last exam, and the extra assignment from Dr. Slack at the start of finals week, it all seems intentional.

36. I had three instances this semester when instructors misrepresented me in print. All three instances occurred after the email from the Office of Institutional Equity on 4/3/17. The hostile environment continued into my rotations at the Southern Arizona Veterans Administration Health Care System and at Davis Monthan Air Force Base.

## Demand

Defendants have unlawfully discriminated against the Plaintiff on the basis of her disability, retaliated against her when she threatened to file a complaint with the Office of Civil Rights, engaged in intentional infliction of emotional distress and civil conspiracy to undermine the Plaintiff's Civil Rights. WHEREFORE, Plaintiff requests this court: 1. Provide the Plaintiff with full disclosure of violations of privacy, comments (slanderous/defaming) and acts by those allowed inappropriate access to the educators, preceptors and students so that these violations can be legally addressed. Without this disclosure, the Plaintiff will continue to feel isolated and unsafe. 2. Award Plaintiff her costs, expenses pursuant to Section 505 (b) of the Rehabilitation Act. **Damages: $6,000,000** 1. Plaintiff has suffered significant slander and defamation of character affecting any past and future careers, emotional distress, loss of educational opportunities, potential wages and benefits had she continued in prior career as a Registered Nurse, potential career development in prior career, loss of physical ability to perform in full capacity as a Register Nurse or Pharmacist. 2. Punitive damages for violation of civil and statutory rights. 3. Plaintiff has suffered and continues to suffer extreme mental stress, anxiety, depression, feelings of lack of self-worth, isolation, rejection and relegation due to the actions of the defendants. 4. Plaintiff has experienced increasing physical disability due to being unable to obtain treatment for a work-related injury which many of the Defendants and students participated. The Plaintiff wants a trial by jury.

Date: 9/13/18

Signature of Pro Se Plaintiff
Rose Ann Karam
3501 N. Camino Esplanade
Tucson, AZ 85750
(520) 730-8802